**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OCTAVIOUS WILLIAMS, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:16-cv-177(JCH) |
| v. | : | |
| | : | |
| CITY OF WATERBURY, et al., | : | JANUARY 5, 2018 |
| Defendants. | : | |

### RULING RE: MOTIONS FOR SUMMARY JUDGMENT (DOC NOS. 22 & 23)

The plaintiff, Octavious Williams ("Williams"), currently incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut, commenced this action by Complaint filed pro se in state court. See generally Compl. (Doc. No. 35-1).[1] Defendant Ryan Cubells ("Cubells") removed the case to federal district court. See Notice of Removal (Doc. No. 1). The defendants are the City of Waterbury ("the City"), Cubells, Martin Scanlon ("Scanlon"), Robert Raad ("Raad"), Waterbury Police Officers Ocasio ("Ocasio") and Marano ("Marano"), Waterbury Police Sergeants J. Knapp ("Knapp") and Napiello ("Napiello"), Waterbury Police Lieutenant Cappozzi ("Cappozzi"), and Waterbury Police Detective Brownell ("Brownell").

Two Motions for Summary Judgment are currently pending before the court: one filed by defendant Cubells (Doc. No. 22), and the other filed by all other defendants ("group defendants") (Doc. No. 23). Williams, proceeding pro se, opposes both pending Motions with a document styled "Pro se litigant opposing motion for summary judgment

---

[1] The court notes that when this case was removed to federal court, the Complaint (as well as the Notice of Removal) were scanned incorrectly such that a portion of each page is missing. See Notice of Removal (Doc. No. 1). In order to review a complete version of the Complaint, the court accessed the Complaint on the Connecticut state court docket and filed it on the docket for this case as document number 35-1.

in requirement of Local Rule 56(b)" and referred to herein as "Plaintiff's Response." See Plaintiff's Response ("Pl.'s Response") (Doc. No. 28).

For the reasons that follow, the defendants' Motions for Summary Judgment (Doc. Nos. 22 & 23) are granted as to Counts One through Eight and Thirteen. Counts Nine through Twelve will proceed against defendant Raad.

## I. STANDARD OF REVIEW

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present "such proof as would allow a reasonable juror to return a verdict in [its] favor," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs.,

Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

## II. FACTS[2]

At the time of the events in question, December 7, 2013, Williams was a resident of Waterbury, Connecticut. See Group Defendants' Local Rule 56(a)(1) Statement of Facts ("Group Statement of Facts") (Doc. No. 23-2) at ¶ 1. Cubells, Scanlon, Raad, Marano, and Ocasio[3] were employed as Waterbury police officers; Knapp and Brownell as Waterbury police detectives; and Cappozzi and Napiello as Waterbury police sergeants. Id. at ¶¶ 2–10.

On December 7, 2013, Ocasio and Marano were dispatched to investigate an armed home invasion on Coe Street in Waterbury. Id. at ¶¶ 11, 47. After interviewing three victims, they broadcast a description of three men who were wanted as suspects

_____

[2] The facts are based on the group defendants' Local Rule 56(a)(1) Statement of Facts and the exhibits submitted by all parties. Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. D. Conn. L. Civ. R. 56(a)(2) and 56(a)(3). Although the defendants informed Williams of this requirement, see Notice to Pro Se Litigant (Doc. No. 23-4), Williams has not submitted a Local Rule 56(a)(2) Statement in the required form. His statement does not respond to each of the defendants' allegations, in the form required by Rule 56 or otherwise, and does not include a citation for each statement. Accordingly, the defendants' facts are deemed admitted. See D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact.").

[3] Ocasio states in his Affidavit that he became a Waterbury Police Office on October 14, 2014. Affidavit of Ocasio (Doc. No. 23-2) at 14. The court assumes that this is a typographical error because, in the next paragraph, Ocasio states that he was on duty with Officer Marano on December 7, 2013, nearly a year earlier. Id.

in connection with the home invasion.  Id. at ¶¶ 11, 48–49.  The broadcast indicated that two of the suspects were driving a BMW with out-of-state license plates and that the third had fled in a dark-colored Jeep Grand Cherokee with partial license plate number ZPS.  Id. at ¶ 13.

At approximately 7:45 p.m., Cubells and Scanlon were patrolling in the area of Ridgewood Street when they saw a black BMW with New York license plate GJB4242 and a black Jeep Grand Cherokee with Connecticut license plate 996ZPS parked on Ridgewood Street.  Id. at ¶ 14.  Both vehicles were unoccupied.  Id.  Cubells and Scanlon parked their police cruiser out of sight and moved to a position where they could see anyone entering the vehicles.  Id. at ¶ 15.  Knapp assigned several police units around the area to intercept the vehicles if they attempted to leave.  Id. at ¶ 17.  Ocasio and Marano were two of the officers assigned to establish the perimeter.  Id. at ¶¶ 50–51.

At approximately 8:35 p.m., two men entered the vehicles and prepared to drive away.  Affidavit of Ryan Cubells (Doc. No. 22-4) at ¶ 10.  Edward Blancaneaux ("Blancaneaux") was in the BMW which fled toward Hillside Avenue.  Williams was in the Jeep which fled toward Central Avenue.  Group Defendants' Statement of Facts at ¶ 16.  Cubells and Scanlon ordered Blancaneaux to stop and get out of the vehicle.  Id. at ¶ 18.  He did not comply with the order.  Id. at ¶ 19.  Instead, Blancaneaux drove the BMW toward Cubells and Scanlon, grazing Cubells and causing him to suffer an injury to his left leg.  Id. at ¶ 20–21.  Scanlon discharged three rounds at the BMW, hitting the car but not the driver.  Id. at ¶ 23–24.  Scanlon did not fire at the Jeep Grand Cherokee.  Id.  Cubells notified the police of the direction taken by the fleeing vehicles.  Id. at ¶ 28.

Scanlon advised dispatch that Cubells had been injured by the BMW. Id. at ¶ 29. A use of force investigation following this incident confirmed that Scanlon had discharged three rounds from his revolver into the BMW and that Cubells had not fired his service weapon on December 7, 2013. Id. at ¶¶ 44–45.

Upon hearing that shots had been fired, Knapp went to Ridgewood Street to secure the scene. Id. at ¶ 30. Knapp then drove Cubells from the scene to St. Mary's Hospital. Id. at ¶ 31.

Police officers, including Ocasio, Marano, and Raad, pursued Williams as he drove away from the Ridgewood Street location until he crashed into a parked and unoccupied car and two police cruisers on Central Avenue in Waterbury. Id. at ¶¶ 32, 52. At that point, Ocasio and Marano left their police cruiser to determine whether there were any passengers in the Jeep Grand Cherokee. Id. at ¶¶ 52–53. They determined that there were no passengers. Id. at ¶ 52. By this time there were many other officers on the scene.

Raad approached the driver's side of the Jeep Grand Cherokee as Williams exited the vehicle. Id. at ¶ 74. Raad ordered Williams to get on the ground but Williams refused. Id. at ¶ 75. After several refusals, Raad brought Williams to the ground by kicking him in the shin and sweeping his legs. Id. Once Williams was on the ground, Raad repeatedly ordered him to show his hands. Id. at ¶ 76. Williams refused, and began tucking his hands under his waist while he was lying on the ground. Id. Raad struck Williams on the left side of his face and the side of his body. Id. Eventually, Williams moved his hands so that they were visible. Id. at 78. Raad then placed Williams under arrest, and Williams was taken to St. Mary's Hospital for his injuries. Id.

Following the incident, Raad completed a Case Supplement Report and Response to Resistance Form.  Id. at ¶ 80.

Cubells, Knapp, Scanlon, Napiello, Cappozzi, and Brownell were not present on Central Avenue when Williams was apprehended.[4]  Id. at ¶ 34.  Brownell was assigned to assist in the investigation of, and obtain witness statements regarding, the incidents in which Williams and Blancaneaux were suspects.  Id. at ¶ 62.  He did not receive this assignment until after Blancaneaux and Williams had been arrested.  Id. at ¶ 63.

Ocasio prepared a report of the incident, after which the investigation was transferred to Napiello who completed a supplementary report which includes reports of Raad, Ocasio and Officer Tiso.  Id. at ¶ 66.  After the report was completed, Cappozzi, Napiello's supervisor, reviewed and approved the report.  Id. at ¶ 67.  Cappozzi was present at Central Avenue but did not arrive there until after Williams had been arrested, handcuffed, and placed in the back of a police cruiser.  Id. at ¶ 69.

Whenever a police officer uses force, the circumstances regarding the use of force are reviewed by the officer's supervisors through the chain of command up to the Chief of Police.  Id. at ¶¶ 83–85.  In addition, the Internal Affairs Division investigates citizen complaints against police officers.  Id. at ¶ 86.  Officers receive in-service and roll call training.  Id. at ¶ 107.  All police officers are subject to supervision to ensure policies and procedures are followed.  Id. at ¶ 105.  All incidents are reviewed by supervisors or

---

[4] The Group Statement of Facts states that Ocasio and Marano were not present on Central Avenue.  Group Statement of Facts (Doc. No. 23-3) at ¶ 34.  This fact is directly contradicted by the Affidavits of Ocasio and Marano who state that they checked the Jeep Grand Cherokee when it stopped after the crash on Central Avenue, see Affidavit of Ocasio (Doc. No. 23-2) at 15, Affidavit of Marano (Doc. No. 23-2) at 20, as well as the Group Statement of Facts itself, see Group Statement of Facts (Doc. No. 23-3) at ¶ 53.

the Internal Affairs Division.  Id. at ¶¶ 91–93.  Discipline is imposed when required.  Id. at ¶ 103–04, 108–12.

All defendants have received training in the use of force, search and seizure, and probable cause for arrest at the Police Academy and as part of their recertification process after graduating from the Police Academy.  Id. at ¶ 120.  Prior to December 7, 2013, the Waterbury Police Department was not aware that any defendant had a propensity to use excessive force in exercising his official duties or to violate departmental rules and policies or the constitutional rights of any person.  Id. at ¶¶ 133–34.

## III.  DISCUSSION

Williams's Complaint alleges thirteen counts against one or more of the defendants.  See generally Compl. (Doc. No. 35-1).  Counts Ones through Four, against all defendants, are based on Williams's assertions that he was falsely arrested and imprisoned.  See Compl. at 4–5.  Specifically, Count One alleges false imprisonment pursuant to the Fourth Amendment; Count Two alleges common law false arrest; Count Three alleges common law false imprisonment; and Count Four alleges intentional infliction of emotional distress ("IIED") resulting from Williams's false arrest and / or imprisonment.  Id.

Counts Five through Eight are alleged against Scanlon and Cubells, and arise from Williams's allegations that Cubells fired shots at Williams's vehicle.  Id. at 5–6. Count Five alleges Fourth Amendment excessive force; Count Six alleges common law assault; Count Seven alleges common law battery; and Count Eight alleges common law IIED resulting from the shots allegedly fired by Cubells.  Id.

Counts Nine through Twelve are alleged against Raad, and arise from Williams's

allegations that Raad assaulted him in the course of the arrest on Central Avenue.  Id. at 6–7.  Count Nine alleges Fourth Amendment excessive force; Count Ten alleges common law assault; Count Eleven alleges common law battery; and Count Twelve alleges IIED.  Id.

Finally, Count Thirteen is alleged against the City of Waterbury.  Id. at 7.  Count Thirteen alleges that the City of Waterbury proximately caused the unconstitutional behavior of all individual defendants by failing to adequately train and supervise them. Id.

As a threshold matter, the court notes that Williams's Response to the Motions for Summary Judgment filed by Cubells and the group defendants neither cites to nor attaches evidence that supports his version of events.  Williams's opposition includes a four-page document styled as a "Pro se litigant opposing motion for summary judgment in requirement of Local Rule 56(b)," which states that "Plaintiff Williams totally disagrees with the defendant's version of the facts" and contains a list of exhibits described as exhibits that "Plaintiff Williams will be citing."  Pl.'s Response (Doc. No. 28) at 1, 2–3. The exhibits listed are all exhibits submitted by the defendants, with the exception of what Williams refers to as "the attached exhibits plaintiff enclosed for court notes."  Id. at 3.  The attached exhibits to which Williams refers include: (1) a newspaper article about Cubells and Scanlon published on May 11, 2015, Exh. A-1 (Doc. No. 28-3) at 12–14; (2) a letter from Susan Hatfield, Assistant State's Attorney, to Christopher Mattel, Assistant U.S. Attorney, dated July 15, 2015, which notes that the U.S. Attorney's Office is currently investigating members of the Waterbury police department and requests all "impeachment material" in his possession relevant to "any member of the Waterbury

Police Department," Exh. 1-B (Doc. No. 28-3) at 15–16; (3) two documents entitled

"Waterbury Police Department Supplemental Report," the first of which was authored by

a Detective Flynn and describes evidence received from an ankle monitor that Williams

was apparently wearing on the night of the arrest in question (which places Williams at

approximately the locations alleged), the second of which states that nineteen pieces of

evidence relevant to the burglary at issue were taken from a BMW with license plate

number GJB4242, Exh. 1-C (Doc. No. 28-3) at 17–19; and (4) an inmate request form

submitted by Williams to a "Ms. Dixon" expressing problems with access to a law library

and other legal resources, Exh. 1 (Doc. No. 28-3) at 20–22.[5]  For the reasons

articulated with respect to each Count below, none of this evidence constitutes evidence

upon which a rational fact finder could find in favor of Williams.

    A.    <u>False Arrest and Imprisonment Claims (Counts One, Two, and Three)</u>

Counts One, Two, and Three allege false arrest and false imprisonment against

all defendants pursuant to Connecticut common law and the Fourth Amendment of the

United States Constitution.  As a threshold matter, the court notes that, although

Williams styles false arrest and false imprisonment as separate counts, <u>see</u> Compl. at 4,

under both common law and title 42, section 1983 of the United States Code, false

arrest and false imprisonment "overlap; the former is a species of the latter."  <u>Wallace v.</u>

<u>Kato</u>, 549 U.S. 384, 388 (2007); <u>see also</u> <u>Singer v. Fulton Cnty. Sheriff</u>, 63 F.3d 110,

118 (2d Cir. 1995) ("The common law tort of false arrest is a species of false

---

[5] Williams submitted two documents styled as "Opposition to Motion for Summary Judgment," which vary slightly but make substantially the same arguments.  <u>See</u> Opposition (Doc. No. 28-2) and Opposition (Doc. No. 28-3).  Williams included the above-described exhibits with both documents labeled "Opposition."  The court refers to Williams's opposition documents generally as "Plaintiff's Response" and includes docket numbers throughout for the sake of clarity.

imprisonment . . . .").  The court therefore treats the allegations of false arrest and false imprisonment as one claim, which the court refers to here as false arrest.

The Connecticut common law tort of false arrest "is the unlawful restraint by one person of the physical liberty of another."  Green v. Donroe, 186 Conn. 265, 267 (1982). In analyzing Fourth Amendment false arrest claims, federal courts typically look to the law of the state in which the arrest occurred.  See Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004).  In order to prevail on a false arrest claim in Connecticut, a plaintiff must show that the charges underlying the arrest terminated in his favor.  See Roesch v. Otarola, 980 F.2d 850, 853–54 (2d Cir. 1992); Miles v. City of Hartford, 445 Fed. App'x 379, 383 (2d Cir. 2011) (noting that, although favorable termination is not an element of false arrest under New York common law, it is an element of false arrest under Connecticut common law and, as a result, an element of section 1983 actions arising from arrests in Connecticut); cf. Weyant v. Okst, 101 F.3d 845, 853–54 (2d Cir. 1996) (distinguishing Roesch to hold that favorable termination was not required where "there was effectively no prosecution at all").

Here, Williams conceded in his opposition to the Motions for Summary Judgment, dated May 4, 2017, that the criminal charges arising from the arrest at issue were still pending.  See Pl.'s Response (Doc. No. 28-1) at 2.  On May 8, 2017, Williams entered a plea of guilty to a charge of Burglary in the First Degree, in violation of Connecticut General Statutes section 53a-101(a)(3), for the events that occurred on December 7, 2013.[6]  Because the underlying criminal charges were resolved by a plea

---

[6] The court accessed the website of the State of Connecticut Judicial Branch to obtain this information, which is available at
http://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=052593e9-f028-45c0-

of guilty, Williams's false arrest claims fail as a matter of law.  See, e.g., DeLaurentis v. City of New Haven, 220 Conn. 225, 250 (1991) (explaining that "favorable termination" is limited to situations in which "the underlying proceeding was abandoned or withdrawn without consideration, that is, withdrawn without either a plea bargain or a settlement favoring the party originating the action").  Therefore, the defendants' Motions for Summary Judgment (Doc. Nos. 22 & 23) are granted with respect to Counts One through Three.

B.    Intentional Infliction of Emotional Distress re: Arrest (Count Four)

In Count Four, Williams alleges intentional infliction of emotional distress ("IIED") against all the individual defendants based on his arrest.  Compl. at 4–5.  To establish liability for IIED, Williams must show: "(1) that the [defendants] intended to inflict emotional distress or that [they] knew or should have known that emotional distress was the likely result of [their] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant[s'] conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  Perez-Dickson v. City of Bridgeport, 304 Conn. 483, 526–27 (2012) (quoting Appleton v. Bd. Of Educ., 254 Conn. 205, 210 (2000)).

The bar for an IIED claim is high.  As the Connecticut Supreme Court has stated, in order to satisfy the IIED standard the conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

---

92ad-d04ff5a225a6.  See Bristol v. Nassau Cnty., 685 Fed. App'x 26, 28 (2d Cir. 2017) (court properly took judicial notice of state court criminal proceedings which were "self-authenticating, publicly available records").

Appleton, 254 Conn. at 211 (quoting 1 Restt. (Second), Torts § 45, cmt. (d), at 73 (1965)).

With respect to the second element of the IIED standard, whether the defendants' conduct was "extreme and outrageous," Williams alleges only that he was guilty of no crime on December 7, 2013, but was nevertheless arrested and imprisoned. See Compl. at 2, 4. The court has already determined that Williams's false arrest claims fail as a matter of law. See supra Section IV(B). The court therefore concludes that, since Williams's arrest and imprisonment were lawful, arresting Williams was not "extreme and outrageous" conduct, as is required to satisfy the IIED standard. See, e.g., Sepulveda v. City of New York, No. 01 Civ. 3054 (DC), 2003 WL 21673626, at *6 (S.D.N.Y. July 17, 2003) (concluding that IIED claim based on arrest was meritless where defendants were entitled to summary judgment on false arrest claim). Furthermore, Williams has neither alleged facts, nor presented any evidence to show, that the defendants' actions with respect to the arrest were otherwise "extreme and outrageous."[7] The defendants' Motions for Summary Judgment (Doc. Nos. 22 & 23) are therefore granted with respect to Count Four.

C. Counts Related to Cubells's Alleged Shooting at Williams's Car (Counts Five through Eight)

In his Complaint, Williams alleges that Cubells fired three shots at Williams's car while Williams was inside "in an attempt to kill or gravely injure him." Compl. at 2, 5. Williams further alleges that Cubells withheld the fact that he had fired shots at Williams's car in his sworn police report. Id. at 2–3. On the basis of these factual

---

[7] Indeed, as the defendants point out in their Memoranda, Williams has not even provided evidence that any of the officers other than Raad actually arrested Williams.

12

allegations, Williams brings a Fourth Amendment excessive force claim (Count Five), a common law assault claim (Count Six), a common law battery claim (Count Seven), and an IIED claim (Count Eight) against defendants Cubells and Scanlon.  <u>See</u> Compl. at 5–6.  Both Cubells and Scanlon argue that they are entitled to summary judgment on Counts Five through Eight because there is no evidence suggesting that either fired shots at Williams's vehicle.  <u>See</u> Cubells Mem. at 11, 15; Group Mem. at 11 ("Only Scanlon discharged his weapon and that was at the BMW and not the Jeep operated by Williams.").

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (internal quotation marks omitted)).  Here, Scanlon has sworn in an Affidavit and in a witness statement attached as an Exhibit to his Affidavit that he fired three shots at the BMW and that neither he nor Cubells fired at the Jeep Grand Cherokee.  <u>See</u> Affidavit of Scanlon (Doc. No. 22-5) at 4, 47.  Cubells has also sworn in an Affidavit that neither he nor Scanlon discharged a firearm at the Jeep Grand Cherokee and that Scanlon did fire shots at the BMW.  <u>See</u> Affidavit of Cubells (Doc. No. 22-4) at ¶¶ 18–21.  Other evidence supports this conclusion.  A witness living in one of the houses on Ridgewood Street stated that she heard only three shots fired.  <u>See</u> Witness Statement of Anna Medina (Doc. No. 22-9) at 2.  The defendants also submitted an investigative report stating that surveillance video from one of the houses on Ridgewood Street showed Scanlon firing three shots at the BMW.  <u>See</u> Investigative Report (Doc. No. 22-6) at 14.

Williams, on the other hand, has submitted no evidence to support his allegation that Cubells fired shots at his vehicle.  Instead, Williams's unsworn Response is focused on attacking the credibility of the defendants.  See, e.g., Pl.'s Response (Doc. No. 28-2) at 5 ("Both Cubells and Scanlon have a great deal of inconsistent statement[s] about said incident."); id. at 6 (describing inconsistent statements by Scanlon that are unrelated to the use of force).  It is well settled that general attacks on credibility are insufficient to withstand a properly supported motion for summary judgment.  See Crawford-El v. Britton, 523 U.S. 574, 600 (1998) ("[I]f the [moving party] has made a properly supported motion [for summary judgment], the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . . ."); McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999) ("[G]eneral attacks upon the defendant's credibility are not sufficient to defeat a properly supported summary judgment motion.").

Williams has not offered any admissible evidence upon which a reasonable jury could credit Williams's version of events.  See Scott, 550 U.S. at 380.  Therefore, Williams has not created a genuine issue of material fact regarding Counts Five, Six, Seven, or Eight, and the defendants' Motions for Summary Judgment (Doc. Nos. 22 & 23) are granted with respect to those claims.

D.     Counts Related to Raad's Use of Force (Counts Nine through Twelve)

In his Complaint, Williams alleges that Raad "viciously beat the plaintiff about the head, face, neck, arms, hands, and ribs," which broke Williams's right arm in several places and caused severe injuries to his face.  Compl. at 3.  Williams brings four counts against Raad arising out of these allegations, including a claim of Fourth Amendment

excessive force (Count Nine), common law assault (Count Ten), common law battery (Count Eleven), and IIED (Count Twelve). Id. at 6–7.

Although the Motion for Summary Judgment filed by the group of defendants is styled as a Motion for Summary Judgment on all claims as to all defendants, see Group Defendants' Motion for Summary Judgment (Doc. No. 23) at 1 and Group Defendants' Memorandum at 5–6, in the portion of the Memorandum of Law in Support of the Motion for Summary Judgment devoted to Counts Nine, Ten, and Eleven, the defendants do not appear to be moving for summary judgment with respect to Raad.[8]  For example, in the portion of the Memorandum devoted to Williams's excessive force claims, the group defendants argue that "there is no credible evidence that Scanlon, Ocasio, Marano, Knapp, Napillo, Capozzi, [or] Brownell utilized unreasonable force upon the plaintiff." Def.'s Mem. at 12.  The defendants acknowledge that "Officer Raad admits that he engaged in a physical altercation with Williams as set forth in his Case Supplemental Report and Response to Resistance Form." Id. at 13.  In the IIED section of the Defendants' Memorandum, the defendants address Counts Four (IIED against all defendants) and Eight (IIED against Scanlon), but make no mention of Count Twelve (IIED against Raad). Id. at 31–35.  Finally, in the section of the Defendants' Memorandum devoted to claims of assault and battery, the defendants acknowledge that Williams has alleged claims of assault (Count Ten) and battery (Count Eleven)

---

[8] The defendants do argue, at some length, that all the defendants except Raad are entitled to summary judgment on Counts Nine, Ten, and Eleven.  However, the Complaint clearly alleges Counts Nine, Ten, and Eleven against only Raad.  Elsewhere, Williams argues that Raad was not the only officer who attacked him.  This representation, however, neither converts his claims against Raad to claims against more defendants, nor does he name the other officers who allegedly assaulted him.  In short, Williams has neither alleged nor supported that any other defendant assaulted him in the course of his arrest on December 7, 2013.  The court therefore does not reach the defendants' arguments with respect to the defendants other than Raad except to note that they are superfluous.

against Raad.  Id. at 35.  The defendants do not move for summary judgment as to these claims.  Id. at 35–36 (moving for summary judgment as to Scanlon on Counts Six and Seven).

In short, despite the defendants' general request for summary judgment on all counts, the substance of their Memorandum fails to demonstrate an absence of material issues of disputed fact as to Counts Nine, Ten, Eleven, or Twelve.  Therefore, to the extent that the group defendants move for summary judgment on Counts Nine through Twelve as to Raad, their Motion is denied.  Counts Nine, Ten, Eleven, and Twelve will proceed against Raad.[9]

E.     Municipal Liability as to City of Waterbury (Count Thirteen)

In his Complaint, Williams alleges that the City of Waterbury (the "City") failed to train and supervise the individual defendants.  Compl. at 7.  The court, like the defendants, construes this claim as a municipal liability claim pursuant to the doctrine first articulated in Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).  Under Monell, a municipality is liable for the unconstitutional actions of one or more of its employees if the actions were the result of a "policy or custom" of the

_____

[9] The group defendants devote significant briefing to addressing a claim not raised by Williams, namely a Fourth Amendment claim that defendants Ocasio, Marano, and Capozzi failed to intervene to stop Raad from violating Williams's constitutional rights.  See Def.'s Mem. at 14–17 (noting that "[a]lthough Williams does not specifically allege a failure to intervene, if officers had observed a violation of his constitutional rights and had a reasonable opportunity to intervene, then a cause of action under §1983 could be stated against one or more of such officers").  However, Williams clearly alleged Counts Nine through Twelve against Raad alone.  See Compl. at 6 (alleging Counts Nine through Twelve against Raad); see also id. at 3 (alleging that Williams was assaulted by "[o]ne or more defendants, including defendant Raad").  The court is mindful of Williams's pro se status and the liberal interpretation to which his pleadings are entitled.  Nevertheless, the court has neither the authority nor the inclination to extrapolate from the factual allegations all conceivable claims that Williams could have brought, particularly at the summary judgment stage, especially when the plaintiff has come forward with no evidence regarding any named defendant other than Raad.  The court therefore does not address the defendants' arguments regarding a theoretical failure-to-intervene claim except to note that such a claim was not raised by Williams.  If the court is mistaken and a failure-to-intervene claim was raised, Williams has not presented any evidence of which defendants failed to intervene.

municipality.  Id. at 694.

To support liability for failure to train police officers, Williams must show that the City's "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). The City's actions must be a deliberate choice among several alternatives. Id. at 389. In addition, Williams must identify a specific deficiency in the City's training program that is "closely related to the ultimate injury" and "actually caused" the violation of his constitutional rights. Id. at 391. In other words, a plaintiff must proffer "evidence as to the city's training program and the way in which that program contributed to the violation." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 n.8 (2d Cir. 2004). In order to prove that a municipal defendant failed to adequately supervise its employees, leading to the constitutional violation, a plaintiff must proffer evidence tending to show "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference." Id. at 128.

The defendants have submitted copies of the curriculum from the police academy regarding use of force and evidence that all the individual defendants had this training both at the academy and during field training. Waterbury Police Department–Basic Training Curriculum (Doc. No. 23-2) at 64–92; Affidavit of Ryan ("Ryan Aff.") (Doc. No. 23-2) at 40–42. All training programs undergo audits by the Police Officer Standards and Training Council and have been found to exceed the Council's requirements. Ryan Aff. at ¶ 10. In addition, the defendants submit evidence of the

Waterbury Police Department practice of reviewing citizen complaints and imposing discipline and training when warranted. Affidavit of Covel ("Covel Aff.") (Doc. No. 23-2) at 32–38.

The City denies any knowledge, prior to December 7, 2013, of facts suggesting that any individual defendant had a propensity to use excessive force or violate departmental rules, policies, or procedures thereby violating the constitutional rights of any person. Covel Aff. at ¶¶ 37–38.

The only evidence that Williams submitted to support his municipal liability claim is a copy of a May 11, 2015, newspaper article describing alleged improper actions by Cubells and Scanlon and noting that Cubells was fired by the City of Waterbury Chief of Police after he was recorded making violently racist statements. Pl.'s Mem. Ex. A-1 (Doc. No. 28-2) at 13–14. However, the article itself states that information regarding alleged improper conduct had not come to light until the previous year, that is, 2014. Thus, the article does not show that the City was aware of improper police conduct in December 2013. Furthermore, Williams has not provided any evidence indicating that the Waterbury Police Department was or should have been aware of a propensity for violence or other issues with any other named defendants, such as Raad. Finally, Williams has neither alleged nor supported any specific flaws with the training and supervision provided by the Waterbury Police Department.

Absent any evidence suggesting that, prior to December 7, 2013, the City was aware of improper conduct and failed to properly address this impropriety through additional training or discipline, there is no basis for a claim against the City. Therefore, the group defendants' Motion for Summary Judgment (Doc. No. 23) is granted with

respect to Count Thirteen.

F.     Conspiracy Liability

Williams does not allege any stand-alone claims of conspiracy liability.  However, in the factual allegations section of his Complaint, Williams asserts that "each [defendant] conspired with each other such person to cause and cultivate the damages described in this Complaint."  Compl. at 1–2 ¶ 4.  He further asserts that the "defendants conspired to violate the constitutional rights of the plaintiff and others by making false arrests based on shoddy and falsified evidence; misrepresentations of material fact in sworn police affidavits; the employment of excessive force; and other unconstitutional undertakings."  Id. at 2 ¶ 7.  Subsequently, in the legal claims section of his Complaint, Williams incorporates paragraph seven of his factual allegations by reference in Counts One through Four.  Id. at 4–5.  That is the extent of his argument with respect to conspiracy liability.

Williams, proceeding pro se, does not identify a legal authority for his conspiracy allegations.  Claims of conspiracy to deprive a person of constitutional rights are cognizable under both sections 1983 ("section 1983") and, specifically for claims of conspiracy to deprive a person of equal protection of the laws, 1985(3) ("section 1985(3)") of title 42 of the United States Code.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  With respect to the first element, the plaintiff must show "some factual basis supporting a meeting of the minds, such that the defendants entered into an agreement, express or

tacit, to achieve the unlawful end." Aho v. Anthony, 782 F. Supp. 2d 4, 7 (D. Conn.

2011) (quoting Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009)).  This can be done

through circumstantial or direct evidence, as the Second Circuit has recognized that

"conspiracies are by their very nature secretive operations."  Pangburn, 200 F.3d at 72

(quoting Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994)).

Section 1985(3) prohibits conspiracies "for the purpose of depriving . . . any

person or class of persons of the equal protections of the laws."  42 U.S.C. § 1985(3).

To prove a section 1985(3) conspiracy, a plaintiff must show: "(1) a conspiracy; (2) for

the purpose of depriving, either directly or indirectly, any person or class of persons of

equal protections of the laws, or of equal privileges and immunities under the laws; (3)

an act in furtherance of the conspiracy; (4) whereby a person is either injured in his

person or property or deprived of any right of a citizen of the United States."  Mian v.

Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  In

addition, a Section 1985(3) conspiracy must be motivated by "some racial or perhaps

otherwise class-based, invidious discriminatory animus behind the conspirators' action."

United Bhd. Of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828–29 (1983) (quoting

Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

In their Motions for Summary Judgment, defendant Cubells and the group

defendants argue that Williams's claim for conspiracy liability fails on two independent

bases: (1) that the intracorporate conspiracy doctrine[10] applies to them, see Group

---

[10] "Under the 'intracorporate conspiracy' doctrine, the officers, agents and employees of a single corporate entity, each acting within the scope of [his] employment, are legally incapable of conspiring together."  Little v. City of New York, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (quoting Salgada v. City of New York, No. 00 Civ. 3667(RWS), 2001 WL 290051, at **8–9 (S.D.N.Y. March 26, 2001)) (applying intracorporate conspiracy doctrine to conspiracy claims under sections 1983 and 1985(3)).  The intracorporate conspiracy doctrine does not apply if any defendant had a personal stake in achieving the

Defs.' Mem. (Doc. No. 23-1) at 29–30; Cubells Mem. (Doc. No. 22-1) at 17, and (2) that Williams cannot show that they entered into an agreement to violate his constitutional rights, <u>see</u> Group Defs.' Mem. at 30–31; Cubells Mem. at 17–18. Because the court concludes that Williams has failed to show a material issue of disputed fact as to the existence of a conspiracy, the court does not reach the merits of the defendants' intracorporate conspiracy defense.

Williams has submitted no evidence to support "a meeting of the minds . . . to achieve [an] unlawful end." <u>Aho</u>, 783 F. Supp. 2d. at 7. In his Complaint, as noted above, he alleges that "defendants conspired to violate the constitutional rights of the plaintiff and others by making false arrests based on shoddy and falsified evidence; misrepresentations of material fact in sworn police affidavits; the employment of excessive force; and other unconstitutional undertakings." Compl. at 2 ¶ 7. In opposing the Motion for Summary Judgment, however, Williams has failed to provide any evidence suggesting that the defendants entered into an agreement to violate his constitutional rights, pursuant to Section 1983 or Section 1985(3). He does direct the court to a number of inconsistencies in the defendants' affidavits and other sworn statements. <u>See, e.g.</u>, Pl.'s Response (Doc. No. 28-3) at 2–5. He also alleges that some of the defendants' sworn statements are inaccurate, such as statements that he was interviewed at the scene of the arrest. <u>See id.</u> (Doc. No. 28-2) at 4 (asserting he was only interviewed at the hospital). Williams does not, however, submit any evidence to support his arguments, such as a sworn affidavit of his own.

---

corporate goal. <u>Id.</u> at 442. Although the Second Circuit has applied the intracorporate conspiracy doctrine to bar section 1985(3) conspiracy claims, it has not yet applied the doctrine to section 1983 conspiracy claims. <u>See</u> <u>Ali v. Connick</u>, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015).

In addition, as to section 1985(3) specifically, Williams has neither alleged nor provided evidence tending to show that the defendants' actions were motivated by his race or any other characteristic protected by the equal protection clause. In his opposition to the Motions for Summary Judgment, Williams alleges that certain officers are racist, but also states that he "was conspired upon by said officers because of their over zealousness and his past criminal history." Pl.'s Response (Doc. No. 28-2) at 10. In the absence of evidence upon which a reasonable jury could conclude that discriminatory animus based on Williams's race (or another protected characteristic) motivated the defendants' behavior, the defendants are entitled to summary judgment as to any section 1985(3) conspiracy claim.

In sum, to the extent that Williams is alleging conspiracy-based liability in addition to individual liability, he has failed to submit evidence upon which a reasonable jury could find that the defendants engaged in a conspiracy to violate his constitutional rights pursuant to either section 1983 or section 1985(3). The court therefore grants the defendants' Motions for Summary Judgment (Doc. Nos. 22 & 23) as to conspiracy-based liability for the claims alleged.

## IV.     CONCLUSION

The Motions for Summary Judgment (Doc. Nos. 22 & 23) are **GRANTED** as to Counts One through Eight and Thirteen. To the extent that the group defendants' Motion for Summary Judgment (Doc. No. 23) moves for summary judgment with respect to Counts Nine through Twelve against Raad, their Motion is **DENIED** as to those Counts. The case will proceed to trial on Counts Nine through Twelve against Raad.

**SO ORDERED**.

Dated this 5th day of January, 2018, at New Haven, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge